JOHN F. COLLINS *vs.* BOARD OF CANVASSERS & REGISTRATION OF THE CITY OF PROVIDENCE.

JANUARY 7, 1937

PRESENT: Flynn, C. J., Moss, Capotosto, Baker, and Condon, JJ.

FLYNN, C. J.  This is an appeal under Public Laws, 1935, Chapter 2195, from a decision of the special vote-tabulation committee of the City of Providence, denying the appellant's petition to open *all* the voting machines used in the election in Providence on November 3, 1936.

The appellant was a candidate in said election for the office of mayor of the City of Providence.  For convenience, the appellant is referred to hereinafter as the petitioner, and his appeal, before us, as a petition.  The real respondents are the five members of the special vote-tabulation committee of the City of Providence, appointed by virtue of the provisions of Chap. 2195, and hereinafter referred to as the committee.  The other respondents are the three members of the board of canvassers and registration of the City of Providence, who apparently are joined because of the petitioner's allegation that they, and not the special committee, are the proper persons to determine and declare the result of the election.  Louis W. Cappelli, who is secretary of state and the legal custodian of the voting machines, is also cited in the petition.

The allegations of facts in the petition are substantially admitted with certain qualifications which are set forth in an agreed stipulation of pertinent facts signed by counsel for the petitioner and for the respondents. The petitioner introduced no other evidence. The record of the proceedings before the committee, as offered by the respondents, was admitted by the petitioner to be the record which the secretary of the committee would testify to as being the official record.

The appellant relies entirely upon his appeal, supported by the stipulation of admitted facts, and upon his contentions relating to the interpretation and application of Chap. 2195. The respondents have made a motion in this court to dismiss the appeal.

At the outset of the hearing, the petitioner's counsel frankly and explicitly made it clear beyond any doubt that he did not charge or rely upon any allegation of fraud; that he offered no evidence to the committee or to us, and that he knew of none to offer, of any fraud, or any irregularity in the conduct of any election officials, or of any illegality in any of the certified election returns from any district, with the possible exception of four districts, which will be discussed later in this opinion.

It appears that the committee met on the day following the election, in accordance with law, to receive, review and tabulate for final totals the election returns and tabulations from the eighty-five districts in the City of Providence, wherein two hundred and forty-nine voting machines were used for the first time under authority of Chap. 2195, the voting-machine law, so-called. Both of the candidates for mayor, James E. Dunne, and the petitioner, John F. Collins, were invited to be present during the meeting. The petitioner appeared personally and was accompanied by his counsel. In their presence and without any protest being made by either the petitioner or his counsel to any act or decision of the committee, the latter proceeded to make final tabulations of the votes for mayor

from the number of votes recorded in the district record books. No reference was made at that time to the certified election returns, which are specifically prescribed by the provisions of Sec. 18 of the voting-machine law. At the conclusion, the committee declared the election of James E. Dunne on the basis of votes shown in the district record books, by a plurality of 1,273 votes, and authorized the issuance of a certificate of election to the successful candidate, and then adjourned.

The petitioner not only failed to object to this decision but actively coöperated with the committee in making it, to the extent that his own counsel drew the motion which the committee later adopted in making its final tabulation and declaration of the result. A day or two later, the petitioner's attention was called, in some way, to the provision of Sec. 18, which provides that the official certified returns, rather than the figures from the record books, shall be used as and for ballots in the tabulations of the committee. He, in turn, called the matter to the attention of the chairman of the committee who thereupon proceeded to reconvene the committee for the purpose of making a new canvass of the votes for mayor, based upon the number of votes appearing upon the certified election returns. During this second canvass, some disputes arose which form the basis of this appeal.

It appeared that the tabulations of the votes cast for mayor, according to the returns used by the committee, gave James E. Dunne a plurality of seven hundred and ninety-one over the petitioner's vote. The apparent difference between the total of votes received by the candidates, according to the district record books, namely, 1,273, and that shown by the returns, namely, 791, was explained substantially by the fact that the record book gave the petitioner only the number of votes cast for him under the Republican designation, whereas the returns gave to him those votes, plus others received by him on two other tickets. This explanation was not seriously disputed by

the petitioner. It also appeared that the petitioner's opponent, though appearing only under the Democratic column, was given, according to the returns, some two hundred forty-eight votes more than he appeared to have in the record books.

The respondents have not raised or pressed before us the question whether the committee had power to reconvene itself, after it had declared the result and had adjourned, in order to correct its error in making final tabulations solely from the votes appearing in the district record books.

Serious doubt has arisen whether such a committee has power to correct its own errors of law, any more than has a district or other court of inferior jurisdiction. Had the question been raised either by the petitioner or by the respondents, we would feel compelled to give it very careful attention. However, since it is not urged by either, and since the committee was acting for the first time under a new and somewhat vague statute, and since the appeal of the petitioner is based largely upon the second meeting, we are disposed, under the peculiar circumstances presented, to give the petitioner on this appeal the benefit of any doubt thereon, and to omit consideration or decision of that particular question. Consequently, we shall assume, for this purpose, the validity of the second meeting and accordingly deal with the disputed questions arising therefrom.

The respondents' motion to dismiss the appeal raises a question concerning the nature and extent of the appeal granted by Chap. 2195. The respondents contend that the appeal is statutory and limited strictly to matters wherein a dispute has arisen before the committee. The petitioner argues that a hearing on his appeal is equivalent to a hearing *de novo*. Unless it clearly appears that the general assembly so intended, we do not feel justified in giving to the appeal, provided for in this statute, a scope which makes the hearing thereon coextensive with a hearing *de novo*. To do so would, in effect, transform this

appellate court into a super-vote-tabulation board and would usurp the discretion and duties which, under the law as presently written, are given expressly to the special committees. However, the provisions of Chap. 2195 do not clearly indicate any such intention on the part of the general assembly. On the contrary, the only provision to be found in the statute expressly granting any appeal, seems entirely consistent with the intention to give only a limited appeal. Section 19, at the end, while specifically addressed to the State special vote-tabulation committee, is also applicable to the city or town special vote-tabulation committee. See *Ruerat* v. *Cappelli et al.*, 56 R. I. 480. This provision reads as follows: "Appeal from the decision of said special committee, *when dispute arises*, may be taken to the supreme court and the secretary of state shall be the special officer summoned to produce books, papers and other materials necessary to conduct due process of law with regard to said appeal." (Italics ours.)

It is extremely difficult, if not impossible, to avoid giving effect to the phrase "when dispute arises" in the above quotation. It is so closely coupled in thought and expression with the words granting an *appeal* from a *decision* of the committee that we think it naturally is inseparable therefrom. If not intended as some limitation upon the appeal, what other reasonable and adequate explanation for its specific presence in that particular place can be advanced? The petitioner has offered none. On the other hand, his construction of the scope of the appeal would require us to strike from the statute these plain, definite words, which the general assembly specifically used—and presumably for some purpose—and to substitute therefor words which the general assembly did not use. No accepted rule of statutory construction has been cited to us which would justify such a strained construction, taking this sentence as a whole and in its context. From the express language used by the general assembly, we conclude that the appeal is not intended to provide a *hearing de novo*.

Prior to the enactment of Chap. 2195, no express right of appeal was given by the election laws to a defeated candidate. Except in extraordinary cases, the method employed thereunder for many years to review decisions of a ballot-counting board was a petition for a writ of *certiorari*. Such a petition, however, was addressed to the *discretion* of the court. Apparently the general assembly decided to change the discretionary feature of the prevailing procedure, as upon *certiorari*, to a similar review of disputed matters to be had as a matter of right. At the same time, it did not expressly grant a *blanket* appeal for a hearing *de novo*, as it could easily have done, if it so intended. Rather, it circumscribed the right of appeal from committee decisions by using immediately the words "when dispute arises", indicating an intent to limit the appeal, at least to matters disputed before the committee and upon which the committee had to make a judicial determination.

Excepting the granting of a review of such decisions as a matter of right, this view of the statute harmonizes substantially with the reasoning of the cases and the practice prevailing in similar ballot-dispute cases which arose under the election law and came to this court on *certiorari*. See *Brereton* v. *Board of Canvassers of City of Warwick*, 55 R. I. 23.

We see no adequate reason at present to construe the appeal, provided in Chap. 2195, otherwise than one which, at least to the extent of being confined to matters wherein dispute has arisen before the committee, is a limited appeal.

In the instant case, the respondents contend that there was no dispute raised by the petitioner before the committee sufficient to substantiate his appeal; that the petitioner's sole request was to open *all* machines because he believed that some discrepancies might be thus discoverable and that such differences, if any, might possibly change the result of the election as declared. It may be

argued, in the light of the language of the statute, that such a general request by the petitioner, and its denial by the committee, did not constitute a sufficient dispute, under this statute, on which to base an appeal. However, in the special circumstances presented in this case, we think that some dispute must have arisen and we prefer to resolve any doubt in favor of the petitioner in this respect. Accordingly, the respondents' motion to dismiss the appeal, as a whole, is denied.

The petitioner's contentions group themselves substantially under the following topics: (1) The committee had no jurisdiction to determine totals and declare the result of the election; (2) the committee acts entirely as ministerial clerks for the board of canvassers, being without powers, duties or discretion under the law; (3) the failure to prepare and check the district record book according to law, in effect, invalidated the certified election returns, even though the latter are properly prepared and signed; (4) the certified official returns are incomplete, in at least four districts, and (5) differences appearing between the totals recorded in the district book and those upon the certified election return-sheets, though not calculated to change the result, require, in a close election, that all machines be opened.

Since this matter came on for hearing before us, we have rendered our opinion in the *Ruerat* case, *supra*. We there discussed the powers, duties and discretion of a city or town special committee, as apparently required by the provisions of Chap. 2195. In view of our discussion and decision in the *Ruerat* case, we are unable to agree with the petitioner's first two contentions.

In passing, however, we concede the force of the petitioner's argument concerning certain gaps and deficiencies throughout this statute. We do not wish it to be understood from that opinion that we approve the practice of leaving to inference, deduction and liberal judicial interpretation, so many matters relating vitally to elections

which should be expressly provided. However, we were constrained to make a liberal construction of this statute in order to best effectuate, as far as possible, all of the provisions and the apparent general purpose of the statute as a whole.

The petitioner's third contention relates to the district record books. Section 18 of Chap. 2195, after stating the mandatory provisions relating to the preparation, checking and signing of the official certified return-sheets, continues with this provision: "The clerk shall thereupon copy such returns in ink in the record book of the elective meeting now provided for by law, and the moderator shall compare the copy made in said book with the counters of the machine, and if they are found to agree, he, together with the clerk, shall sign such record book." A casual inspection of the two provisions discloses that the district record books and the certified official return-sheets are not prepared in the same manner; nor are they checked with the counters of the voting machine and signed in the same way or by the same officials. The representatives of each party, who must compare the returns with the machine counters and then sign the certified return-sheet, are not required by law to do the same things with the district record book. Only the moderator checks the figures of the district record book with the machine.

It is quite possible that no representative of one of the political parties would compare or sign the district record book. This difference and its effect are inescapable. While the district record book and the district certified return-sheet should agree, and while it would serve a more usual purpose if both were actually alike in all details, the statute itself, and not our interpretation, makes the difference. Apparently different purposes are intended respectively for the record book and for the certified return. In addition to the provisions relating to their different preparation and signing, Sec. 18, as above quoted, describes the book "as the record book of the elective meeting *now provided for by law.*" (Italics ours.)

General Laws, 1923, Chap. 10, "Of the Manner of Conducting Elections", in Sec. 8, provides as follows: "The moderator or warden and clerk of such meeting shall make a record in ink, in a book to be provided for that purpose by the secretary of state: *First,* Of the date of such meeting; *Second,* Of the number of names checked upon the voting-list used at such meeting; *Third,* Of the number of votes cast thereat for each candidate, and for what office; *Fourth,* Of the number of votes cast for and against any proposition of amendment of the constitution; and *Fifth,* Of the number of votes cast for and against any question which has been voted upon at said meeting, and shall each sign such record in ink. Said book shall in no case be enclosed in any package containing ballots, but shall be taken by the moderator or warden of said meeting, upon the adjournment thereof, and be by him kept separate and apart from said ballots, where it will not be exposed to loss or destruction with them, and be by him delivered in person to the clerk of the town or city in which such meeting was held, within twelve hours after such record is made and signed. In case the ballots, or any of them, given in at such meeting are lost or destroyed, the record in such book shall be evidence of the matters therein contained and may be used in the same manner as such ballots might have been by the board or council authorized to make the final count thereof. The record of each class of ballots shall be made in said book before they are sealed up as provided in this chapter." This section in the election law is retained by reference in Chap. 2195 and expressly by Sec. 27 thereof, which retains all of the existing election laws which are not inconsistent with the provisions of this chapter. Thus, it is further emphasized that the district record books and the certified returns are not inseparably joined; that only when the returns are lost or destroyed— and we add, when the machines are not available in *statu quo*—would there be legally a recourse to the district record books by a committee as a basis for making its final

tabulations; and that failure to comply with the law in preparing, checking or signing the record books or the presence of inaccuracies therein, cannot by themselves invalidate the certified election returns which have been properly prepared in substantial compliance with Chap. 2195.

The committee, therefore, in the circumstances of this case, had no authority to make its final tabulations and declaration of the result solely from the totals in the district record books. It was required under the *Ruerat* decision, *supra,* to make its tabulations for final totals from official returns which were prepared and certified in substantial compliance with the law.

On his fourth contention, the petitioner offered no protest or evidence that any of the eighty-five district official returns, excepting four, were illegal or irregular in any way. All of them, excepting four, apparently were prepared, checked and signed in substantial compliance with the provisions of law. In the absence of fraud, or of some other sufficient showing, apparent upon the face of these returns, or otherwise, or of some substantial objection on the part of the petitioner, we can not say, under the law as it is presently written, that the committee abused its discretion in using such returns as ballots and as the basis for making its final tabulations. The petitioner's motion, therefore, as a whole, was properly denied. See *Ruerat* v. *Cappelli et al., supra.*

On the other hand, the respondents insisted upon using, in the case of four districts above excepted to, returns where the face of the returns showed noncompliance with the provisions of Sec. 18 of the statute in question. In ward four, district one, the committee sought to use figures written upon a sample ballot, or work-sheet, which purported to be the number of votes cast in each machine for each candidate. This work-sheet was not signed by anybody. The official return-sheet was signed by the proper persons but was entirely blank and had no figures repre-

senting the votes upon any of the machines. In ward ten, district six, ward eleven, district four, and ward thirteen, district two, the returns were each incomplete in that each lacked the signature of the moderator in the second certificate. The committee likewise insisted upon using these returns in its computations and tabulations. Under the authority of our opinion in *Ruerat* v. *Cappelli et al.*, *supra,* the committee had no right to use any of the returns in the four above-mentioned districts, since they were not prepared in substantial compliance with the law. The committee, therefore, was unable to perform its primary duty in making its tabulations for final totals for the office of mayor, and in declaring the result, without opening and taking the number of votes from the counters of the machines used in each of the above-mentioned districts.

The petitioner's fifth contention is general. It asks us, as a matter of law, to open all machines in a close election, regardless of the absence of fraud, illegalities, irregularities or any sufficient dispute to form the basis of an appeal. Such an argument and request are more properly to be addressed to the legislature than to the court. As bearing on this point, generally, he cites several cases from New York. We are in entire sympathy with the conclusions reached therein, but it must be remembered that the New York Code of election laws of that State (Cahill's Consolidated Laws of New York, 1930, 2d ed., Chap. 16, § 330 to § 335) differs widely from Chap. 2195. Apparently the code of that State provides for relief upon a direct and verified petition to the Supreme Court in the first instance; secondly, the complaint must allege sufficient grounds of fraud, illegality, irregularity, or material discrepancies in the returns, and be supported by oral or written evidence, in order to obtain a hearing before the court; and thirdly, the matter seems to be left, upon proper showing, to the sound discretion of the Supreme Court of that State. See New York Code, *supra.* If the general assembly had specifically left this discretion with us in the first instance,

we would not hesitate to use it liberally, to the end that all reasonable doubt would be dispelled, and that the successful candidate would take office by a title not only unassailable in law but unclouded by any just suspicion. But, the general assembly, by Chap. 2195, expressly gives that discretion to the special vote-tabulation committee and not to the court. Consequently, the question presented to us is whether, as a matter of law on the record and evidence in the instant case, the committee acted in a wholly arbitrary manner and therefore abused its discretion. In making this determination, we are bound by the provisions of that law, as it apparently was intended and written, regardless of what we may personally feel would be the more practical and satisfactory solution. The voting machines used in the four districts above referred to must be opened, and the votes cast for each candidate for mayor must be taken therefrom.

Under authority of *Ruerat* v. *Cappelli et al.*, recently decided, the appeal is sustained as to voting machines numbered 915 and 888, used in ward four, district three; machines numbered 838, 840 and 1064, used in ward ten, district six; machines numbered 1205, 751 and 708, used in ward eleven, district four; and machines numbered 1207, 817, 818 and 828, used in ward thirteen, district two; the restraining order heretofore entered is dissolved, and said Louis W. Cappelli, as secretary of state, is authorized to open said voting machines at any time in accordance with the powers conferred on him by statute. Because of the necessity of opening said machines before inauguration of the mayor on January 4, 1937, the above order was incorporated in a brief opinion filed in this cause on January 2, 1937.

*Edward M. Sullivan*, for appellant.

*Daniel E. Geary*, City Solicitor, *John T. Walsh*, Assistant City Solicitor, for appellee.